IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MARY GETTS BLAND,                    )
                                     )
        Plaintiff,                   )
                                     )
             v.                      )    1:10cv1030 (JCC/JFA)
                                     )
FAIRFAX COUNTY, VIRGINIA,            )
                                     )
        Defendant.                   )


**M E M O R A N D U M    O P I N I O N**

        This matter is before the Court on Defendant Fairfax
County, Virginia's (the "Defendant" or the "County"), Motion for
Summary Judgment [Dkt. 18] (the "Motion").  For the following
reasons, the Court will grant in part and deny in part
Defendant's Motion.

**I.  Background**

        This case arises out of alleged incidents of sexual
harassment by a male Fairfax County firefighter against a female
Fairfax County firefighter.

        Plaintiff Mary Getts Bland ("Plaintiff" or "Bland")
alleges that by allowing Lieutenant Timothy Young ("Young") to
harass her, the County "denied her the equal protection of the
laws in violation of Title VII [of the Civil Rights Act of 1964,
as amended, 42 U.S.C. § 2000e to e17 ("Title VII")] and the
Equal Protection Clause of the Fourteenth Amendment to the

1

Constitution." (Complaint [Dkt. 1] ("Compl.") ¶ 9.) Bland also alleges that after she complained of Young's alleged conduct, the County violated Title VII and the Equal Protection Clause by retaliating against her in impeding her transfer to a different shift. (Compl. ¶¶ 11-12.)

## A.   Defendant's Evidentiary Arguments

Before turning to the facts of this case, the Court will address the various evidentiary issues raised by Defendant in its Reply. [Dkt. 28.]

Defendant argues that this Court should not consider certain exhibits to Plaintiff's Opposition to Defendant's Motion because Bland did not identify certain witnesses and documents in her Federal Rule of Civil Procedure 26(a)(1)(A) disclosures or her responses to Defendant's discovery requests. (Reply [Dkt. 28] at 2.)

### i.   Undisclosed Witnesses

Federal Rule of Civil Procedure 37(c)(1) "provides that a party who fails to [provide information or] identify a witness as required by Rule 26(a) or (e) is not allowed to use that [information or] witness to supply evidence on a motion." *Hoyle v. Freightliner, LLC*, --- F.3d ----, No. 09-2024, 2011 WL 1206658, at *4 (4th Cir. Apr. 1, 2011). Despite this failure to disclose the identity of a witness, a party may "[e]scape from the [Rule 37] sanction" if it shows "that the failure to

2

disclose is substantially justified or harmless. Fed. R. Civ.
P. 37(c)(1). *Id*. In determining whether nondisclosure of a
witness is substantially justified or harmless, courts should
consider:

> (1) the surprise to the party against whom the witness was
> to have testified; (2) the ability of the party to cure
> that surprise; (3) the extent to which allowing the
> testimony would disrupt the trial; (4) the explanation for
> the party's failure to name the witness before trial; and
> (5) the importance of the testimony.

*Id*. (quoting *Southern States Rack & Fixture v. Sherwin-Williams
Co.*, 318 F.3d 592, 596 (4th Cir. 2003)). The same factors guide
the Court's consideration with respect to evidence. *See
Southern States*, 318 F.3d at 597. "A district court has 'wide
latitude in controlling discovery and . . . its rulings will not
be overturned absent a showing of clear abuse of discretion.'"
*Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 196 (4th Cir.
2003) (quoting *Ardrey v. United Parcel Serv.*, 798 F.2d 679, 682
(4th Cir. 1986)).

Defendant argues that, pursuant to Rule 37(c)(1), the
Court should not consider the following exhibits offered by
Plaintiff because Bland did not identify the witnesses: (1) the
deposition testimony of Hugh Caldwell Clarke, (Plaintiff's
Opposition [Dkt. 26] ("Opp.") Exhibit ("Ex.") 28); (2) the
deposition testimony of Kendall Thompson, (Opp. Ex. 29); (3) the
deposition testimony of Daniel Thompson, (Opp. Ex. 32); (4) the
deposition testimony of Catherine Riley-Hall, (Opp. Ex. 35); (5)

the deposition testimony of Mark Nash, (Opp. Ex. 44); (6) the transcript of an August 26, 2010 interview with Daniel Thompson, (Opp. Ex. 42); (7) the declaration of Seo He Chae, (Opp. Ex. 3); (8) the declaration of Stacey Bailey, (Opp. Ex. 5); (9) the declaration of Alessandra Hurtado, (Opp. Ex. 20); and (10) the declaration of Alyssa Slotkin Vance, (Opp. Ex. 21).

Plaintiff did not identify: Hugh Caldwell Clarke, (Opp. Ex. 28); Kendall Thompson, (Opp. Ex. 29); Mark Nash, (Opp. Ex. 44); and Seo He Chae, (Opp. Ex. 3), in Plaintiff's Rule 26(a)(3) Pre-Trial Disclosure [Dkt. 13] ("Plaintiff's Pre-Trial Disclosure").

Plaintiff did identify: Daniel Thompson, (Opp. Exs. 32 and 42); Catherine Riley-Hall, (Opp. Ex. 35); Stacey Bailey, (Opp. Ex. 5); Alessandra Hurtado, (Opp. Ex. 20); and Alyssa Slotkin Vance, (Opp. Ex. 21), in Plaintiff's Pre-Trial Disclosure.

For those witnesses that Bland identified in Plaintiff's Pre-Trial Disclosure, the Court finds no reason to disregard their testimony under the *Southern States* standard, even assuming Plaintiff's Pre-Trial Disclosure fell short of Rule 26 because Defendant cannot be surprised to see their testimony referenced here. 318 F.3d at 596.

For those witnessed *not* identified in Plaintiff's Pre-Trial Disclosure, the Court will not permit Plaintiff to use

those witnesses to supply evidence in opposition to the motion. *Hoyle*, 2011 WL 1206658, at \*4. This does not mean, however, that evidence properly presented that concerns those witnesses will be disregarded.

ii.    Defendant's Objection to Bailey Declaration

Defendant argues that although Plaintiff identified Stacey Bailey in her pre-trial disclosures, "Bland neither produced [Bailey's declaration], nor indicated[] that she intended to rely on Bailey's declaration in support" of her case. (Reply at 3.) That is not the situation addressed by Rule 37(c)(1). Rather, Rule 37(c)(1) provides that a party who fails to identify a witness as required by Rule 26 cannot use that witness to supply evidence on a motion. Bland identified Bailey as a witness, as the County concedes, so Rule 37(c)(1) does not bar her from using Bailey to supply evidence.[1]

Defendant, however, argues that Bailey's declaration was prepared to support Bailey's own claim against the County for sexual harassment and that if the Court considers Bailey's declaration, "[the Court] would place the County in the position of litigating Bailey's allegations" in both this and Bailey's own case. (Reply at 3, n.4.) The Court will consider Bailey's

---

[1] The County also argues that the Court should exclude the Bailey Declaration under Federal Rule of Evidence 403. (Supplemental Memorandum [Dkt. 31] ("Supp. Mem.") at 14.) "[W]hile it is not unheard of to exclude evidence under Rule 403 at the summary judgment stage . . . normally the balancing process contemplated by that rule is best undertaken at the trial itself." *Adams v. Ameritech Serv., Inc.*, 231 F.3d 414, 428 (7th Cir. 2000). The Court sees no reason to alter that normal balancing process here.

declaration insofar as it provides proper evidence in opposition
to summary judgment pursuant to Rule 56.  The Court makes no
finding as to Bailey's own claim against the County, and its
consideration of Bailey's declaration here will have no
preclusive or other effect on Bailey's own claim against the
County.

Defendant also argues that "much of what is stated in
the declarations of Chae, Hurtado, Vance, and Bailey is not
based on personal knowledge or it is the declarant's opinion or
belief." (Reply at 4.)  An affidavit or declaration used to
support or oppose a motion for summary judgment must be made on
personal knowledge and must set out facts that would be
admissible in evidence.  Fed. R. Civ. P. 56(c)(4).  Lay opinion
testimony, however, may appropriately be admitted if it is
rationally based on the perception of the witness.  *See* Fed. R.
Evid. 701.  Accordingly, a wholesale exclusion of these
declarations would be inappropriate; the Court will consider
these declarations to the extent they contain relevant and
otherwise proper evidence in opposition to summary judgment
pursuant to Rule 56.

iii.    Undisclosed Memoranda

Defendant argues that Plaintiff may not rely on
certain documentary evidence: (1) a memorandum dated October 27,
2006, concerning Stacey Bailey's sexual harassment complaints

against Captain James Iacone and others, (Opp. Ex. 15); (2) a memorandum dated January 5, 2007, concerning Stacey Bailey's sexual harassment complaints, (Opp. Ex. 16); (3) a memorandum dated April 18, 2007, concerning Stacey Bailey's sexual harassment complaints, (Opp. Ex. 17); (4) a memorandum dated May 15, 2007, concerning complaints of two subordinate employees against Captain Iacone, (Opp. Ex. 19); and (5) a memorandum dated September 4, 1998, concerning a complaint against Captain Iacone, (Opp. Ex. 24).

Defendant argues that these memoranda "were neither identified, nor produced, in Bland's disclosures or her response to the County's document request," so the Court should not consider them. (Reply at 4.) The Court finds any such nondisclosure harmless for purposes of Rule 37(c)(1) exclusion because Defendant was well aware that these memoranda might be offered.

Bland did identify these documents. In Plaintiff's Pre-Trial Disclosure, she indicates that she may proffer "[i]nternal EEO [f]iles re: other cases of sexual harassment" as exhibits. Though this is a broad statement, the County would know what "EEO [f]iles" Bland had in her possession because, significantly, they are the *County's own documents*, presumably *produced by the County* during discovery. Thus, the County's argument that Bland did not "produce" the memoranda overstates

the point. And, given the elements necessary to support Bland's sexual harassment claims, the County should not be surprised to see the documents it produced used as support for a "custom" of sexual harassment. Accordingly, the Court will not strike these memoranda.

           iv.     Bland's Claim that She Notified Captain Eshelman

      As discussed more fully below, Bland asserts that she notified Captain Edith Eshelman ("Eshelman") in March of 2006 about Young's sexual harassment during recruiting. (Opp. at 7, 13.) In its Supplemental Memorandum, the County argues that because Bland neither disclosed Eshelman as a witness in her Rule 26(a) disclosures nor disclosed prior to Bland's late interrogatory responses the fact that she notified Eshelman, Bland should not be permitted to use that fact in support of this Motion. (Supp. Mem. at 13-14.)

      The Court disagrees. First, the Court first notes that *Bland* is the witness testifying that she told Eshelman in March 2006, so non-disclosure of *Eshelman* as a *witness* is not dispositive. Second, the County should not be surprised by Bland's testimony. Though produced late, Bland disclosed this fact in her interrogatory responses, which the County received on February 14, 2011, (Reply at 13 n.7), some six weeks before it filed this Motion. The County had notice of this fact by that time, so there is no last minute sandbagging or

gamesmanship. Though discovery had closed by February 14, 2011, the County could have moved to depose Eshelman or to re-depose Bland with respect to this issue. The case docket reflects no discovery motions on the part of the County as to this or other discovery issues. The Court also notes that though the County addresses Bland's telling Eshelman in its Reply, it did not include any evidentiary objection to the Court's *considering* this fact among the myriad evidentiary issues raised there; instead, the County waited until its Supplemental Memorandum to do so, after oral argument regarding the Motion and after the Court's oral order at that argument as to Bland's Title VII claim for sexual harassment.

v.    Hearsay

Defendant argues that much of Bland's evidence is "based on inadmissible evidence that was not properly disclosed or identified and, therefore, must be stricken, and/or evidentiary materials that are nothing more than inadmissible gossip and opinion." (Reply at 18.) In support of this contention, Defendant cites *Greensboro Professional Firefighters Association v. Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995). As to whether Plaintiff's evidence in opposition was properly disclosed or identified, the Court has addressed that argument above. With respect to Defendant's hearsay argument, the Court will consider statements only for their non-hearsay purposes.

A party opposing summary judgment must put forth material that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2). Thus, among other considerations, witnesses' statements offered in opposition to summary judgment cannot be considered if they are hearsay. *See Md. Highways Contractors Ass'n v. Md.*, 933 F.2d 1246, 1251 (4th Cir. 1999).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). "'[E]vidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement.'" *United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010) (quoting *Anderson v. United States*, 417 U.S. 211, 220 n.8 (1974)). Thus, a statement is not hearsay when the statement is offered to show that the County was on notice of the statement. *See Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 660 (5th Cir. 2002) (holding that testimony of three other complaints of sexual harassment was not hearsay because it was offered to prove that the employer was on notice rather than for the truth of the matter asserted), abrogation on other grounds recognized by *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007); *see also Southerland v. Sycamore Cmty Sch. Dist. Bd. of Educ.*, 125 F. App'x 14, 22 (6th Cir. 2004) (holding that rumor testimony and

notes were admissible as non-hearsay because they were not
offered to prove the truth of the matters they asserted, but
instead were used to show that government officials had
knowledge of the problem); *Dixon v. Int'l Fed'n of Accountants*,
No. 09cv2839, 2010 WL 1424007, at *2 n.4, (S.D.N.Y. Apr. 9,
2010) (holding that evidence of complaints by other employees
against the plaintiff was non-hearsay because it was not offered
for the truth of the matter asserted--that the plaintiff
actually did the things complained of--but offered to show that
plaintiff's employer was on notice of the complaints).  The
Court, then, will consider statements for their non-hearsay
purposes if such purposes are otherwise relevant and proper.

    B.    Factual Background

    The facts are as follows.

        i.    The Parties

    Bland worked as a firefighter in the Fairfax County
Fire and Rescue Department (the "Department") from January 2002
to June 2010, when she retired.  (Memorandum in Support [Dkt.
19] of the Motion ("Mem.") at 2.)  During the time period
relevant here, Young also worked as a firefighter in the
Department.  *Id.*

    Bland initially met Young in the summer of 2001 during
her recruitment process with the Department.  *Id.*  At that time,
Young worked in recruiting, and he scheduled Bland's interview,

physical exam, and other recruiting-related appointments. *Id.*
Prior to her initial appointments, Bland took and passed a
written exam and a physical abilities test, referred to as the
"CPAT." *Id.*

Bland and Young met for a second time when she
accepted his invitation to tour the building that housed the
Department's administrative offices. (Mem. at 3.) During this
second meeting, Bland thought Young was friendly, and he did not
do or say anything that Bland found offensive. (Mem. at 3;
Bland Deposition Transcript ("Dep. Tr.") 25:11-13, at Mem. Ex.
1.)

ii.    August 2001 Incident

Bland next met with Young on August 22, 2001, for a
personal interview. *Id.* In this interview, Young administered,
and Bland completed a form containing, a series of prepared
questions. *Id.* According to Bland, while she was completing
the form, Young asked her a number of additional questions:
"does your husband approve of this profession," "do you enjoy
having sex with more than one partner," and "do you like to be
watched while you masturbate." *Id.* Young also told Bland that
he "knew things about [her]" and asked her to accompany him to
an adult sex-toy shop. *Id.*

Bland did not tell Young that these questions offended
her and even answered his questions, (Bland Dep. Tr. 37:2-5),

but she believes he should have seen from her demeanor that she was offended, (Bland Dep. Tr. 36:11-19).

Young told Bland that, if she passed the written examination and the CPAT, she "would certainly get the job" and that she "was exactly what the County was looking for." (Bland Dep. Tr. 56:20-21, 57:3-4.) Bland, however, thought Young had a "very big role to play" in the section process, (Bland Dep. Tr. 55:21-22), and although Young did not make the final hiring decision, he made recommendations to his captain regarding hiring, (Young Dep. Tr. 9:3-11, at Opp. Ex. 25).

During the recruitment process, Bland did not report Young's conduct to anyone in the Department. (Mem. at 4; Bland Dep. Tr. 57:18-22.) Bland did not do so because she "felt [she] would not get hired," though Young did not say anything to her that led Bland to believe she would not be hired if she complained about his behavior. (Bland Dep. Tr. 58:1-5.)

iii.     Bland Offered a Position with the Department

On August 17, 2001--prior to her interview with Young--Bland had received from the Department a conditional offer of employment. (Mem. at 4.) After the interview, the Department appointed Bland as a recruit firefighter. (Mem. at 4; Bland Dep. Tr. 59:18.)

iv.     January 2002 to July 2002

At recruit-firefighter orientation, on January 14, 2002, Bland saw Young but had no contact with him.  (Mem. at 4.) Young smiled at Bland "from across the room," which she found offensive.  (Bland Dep. Tr. 61:5-8.)  Bland attended recruit school from January 2002 to July 2002.  (Mem. at 4.)

While attending recruit school at the Department academy, Bland received "two or three" telephone calls from Young.  *Id*.  During these conversations, Young asked Bland to go with him to an adult sex-toy shop, asked her about her family, husband, and marriage, and told her he "[knew] things about [her]."  (Mem. at 5.)  Bland did not see Young in person during this period.  *Id*.

v.     July 2002 to June 2003

Bland worked at Fire Station 1 from July 2002 to June 2003.  *Id*.  During this time period, Bland received "three or four" telephone calls from Young, the content of which was "[s]imilar to identical" to the telephone calls she received while at recruit school.  (Bland Dep. Tr. 72:17-20, 73:4-6; Mem. at 5.)  Bland did not ask Young to stop calling her.  (Bland Dep. Tr. 73:22-23; Mem. at 5.)

vi.     June 2003 through October 2007

From June 2003 until November 2007, Bland had contact with Young on two occasions. (Mem. at 5.) Bland had no complaints as to Young's behavior on these occasions. *Id.*

vii.    <u>November 9, 2007 Incident</u>

On November 9, 2007, Bland was working as an engine driver for Fire Station 17 on the B-shift. (Mem. at 6.) On that day, Young, who normally worked a C-shift at Fire Station 40, worked overtime in the field, referred to as a "call back," for Fire Station 17 on the B-shift as officer in charge of the engine on which Bland served. *Id.* When Young arrived to work the call back at Fire Station 17 in the morning of November 9, 2007, he attempted to speak with Bland. *Id.* Young told Bland he "[knew] all about [her]," but when he saw her reaction he said he would "stop right there." *Id.* Throughout the day, Young and others in the crew engaged in "continual banter laced with sexual innuendos," though not directed at Bland. (Bland Dep. Tr. 80:15-21; Mem. at 6.)

At a certain point on November 9, Young asked Bland to drive the engine and crew across the street to get ice cream at Dairy Queen. (Bland Dep. Tr. 82:9-12; Mem. at 6.) Bland was irritated and responded that she would "drive [Young's] fat a** across the street to Dairy Queen." (Bland Dep. Tr. 82:9-12; Mem. at 6.) Young responded by asking Bland if she was "checking out [his] a**," to which she responded "no." (Bland

15

Dep. Tr. 82:9-12; Mem. at 6.)  Though that was "the end of it"

on that day, Bland admits that "absolutely everything [Young]

does is offensive" to her.  (Bland Dep. Tr. 82:19-23; Mem. at 6-

7.)

        viii.     <u>November 25, 2007 Incident</u>

On November 25, 2007, Bland and Young's units were

dispatched to the same fire scene.  (Mem. at 7.)  At some point

while the units were on the scene, Bland was standing next to a

fire engine with volunteer firefighter, and friend, Nancy

Sanfacon ("Sanfacon"), when Young passed by.  *Id.*  As he passed,

Young was carrying a "pike pole," a tool used to pull down

ceilings, and he glanced at Bland, "smiled his grin" and said

"this looks like it would hurt" and "kind of made that gesture

with it."  (Bland Dep. Tr. 82:19-23; Mem. at 6-7.)

Bland took this as a threat that he "would like to"

physically hurt Bland, "not at that moment, but that he would

like to."  (Bland Dep. Tr. 90:23, 91:5-8; Mem. at 7.)  Bland

interpreted Young's conduct as "[s]exual in nature and a step

further into sexual assault."  (Bland Dep. Tr. 92:5-6.)

Bland makes a second complaint about Young's conduct

on November 25, 2007.  (Mem. at 7.)  Young was standing on the

tail board of the fire engine and was handing a fire hose to

Bland.  *Id.*  Each time Bland pulled on the hose, Young "would

smile at [Bland], wink or whatever, and say 'you are squeezing me.'"  (Bland Dep. Tr. 96:22-97:1.)

ix.     Bland Reports Young's Conduct

The parties dispute when Bland first reported Young's conduct.  Plaintiff asserts that she notified Captain Edith Eshelman in March of 2006 about Young's sexual harassment during recruiting.  (Opp. at 7, 13; Opp. Ex. 1 at 2; Bland Declaration ("Decl."), at Opp. Ex. 45 ¶ 2.[2])  Bland asserts she told Captain Eshelman about Young's comments during Bland's interview, including asking whether Bland liked to be watched when she masturbated and whether she liked to have sex with more than one person at a time.  (Opp. at 13.)  Bland asserts that Captain Eshelman took no action on Bland's complaint.  *Id*.

Defendant asserts that Bland did not report the sexual harassment until after the November 25, 2007, incidents, when Bland reported her complaints to Captain Cheryl Hemingway, who is an equal Employment Opportunity ("EEO") counselor for the Department.  (Mem. at 8.)  Captain Hemingway also was part of the battalion management for Bland's battalion.  *Id*.  Captain Hemingway advised Bland that Bland could pursue a formal or informal complaint, that she could contact Captain Felicia Edwards, the Department's EEO officer, that she could contact

---

[2] Defendant argues in its Reply that Bland cannot rely on her response to Defendant's Request for Admission because her response was untimely.  (Reply at 13, n.7.)  The Court looks to Bland's Declaration, submitted with her Opposition, for this fact.

Nan Butler Roberts and Kathy Smith, investigators from the County's Office of Human Rights and Equity Programs ("Equity Programs"), or contact the U.S. Equal Employment Opportunity Commission. (Mem. at 8-9.) Captain Hemingway also gave Bland an EEO intake form and told her to make a written account of her complaints against Young. *Id*. Captain Hemingway encouraged Bland to pursue her complaint. *Id*.

On December 9, 2007, Bland met with Captain Edwards and Captain Hemingway. *Id*. After that meeting, Captain Edwards conducted an investigation into Bland's complaints, which included a February 26, 2008 interview with Bland. *Id*.

Captain Edwards performed the investigation, including interviewing Bland, Young, and individuals Bland identified as having information regarding her complaints, including individuals present on November 9, 2007. (Mem. at 10.) Captain Edwards also contacted other women in the Department whom had contact with Young during the recruiting process. *Id*. The women Captain Edwards contacted reported that they had no problems with Young. *Id*. Captain Edwards also found that at the time of Bland's complaint, no person had complained of sexual harassment by Young. *Id*.

x.    The County's Response

Though Plaintiff disputes the effectiveness of the Department's response, (Opp. at 15), the parties agree that at

the conclusion of Captain Edwards's investigation, she prepared a written report detailing her investigation and conclusions. (Mem. at 10.) As a result of the investigation, Young received a written reprimand and was ordered to attend EEO training. *Id*. Young was directed to stay away from Bland, a direction in place beginning at the time of Bland's initial complaint, and Bland was directed to report to her Battalion Chief if she encountered Young while at work. (Mem. at 11.) If Bland encountered Young at work, the Battalion Chief was to reassign him. *Id*. In a further precaution, for a period of six months in 2008, Young was assigned to a fire station at the opposite end of the County from Bland's station. *Id*.

Plaintiff asserts that though Young received a reprimand, it was "meaningless" because it did not affect his pay, his eligibility to work overtime shifts, his rank, or his duties. (Opp. at 15-16.) Because Young had no prospect for promotion, due to having scored too low on the captain's exam, and because Young made more money as a lieutenant due to additional pay for overtime shifts not available to captains, the reprimand "had no effect on him other than as a piece of paper that went into his file." *Id*.

Bland had no contact with Young after the November 25, 2007 incident until she retired in June 2010. (Mem. at 11.)

Plaintiff asserts that in two instance, Young was staffed on the shift following Bland's, so there could have been a possibility that Bland would run into Young. (Opp. at 18.) Plaintiff also asserts that Young once responded to a call that Bland's unit responded to, but Bland was told to stay in the fire truck. (Opp. at 18.) There is no dispute, however, that Bland had no contact with Young after November 25. (Bland Dep. Tr. 122:18-20.)

xi.     Bland Requests a Transfer

On April 1, 2008, Bland requested a transfer from B-Shift to A-Shift. (Mem. at 11.) Bland's reasons for wanting to transfer to A-Shift were "hardships." (Bland Dep. Tr. 136:1-13.) Bland's then-fiancée also was on A-Shift. (Bland Dep. Tr. 136:1-10.) Plaintiff asserts that Deputy Chief Dodwell impeded her transfer to A-Shift. (Opp. at 21.)

Plaintiff asserts that the "County routinely accommodates requests by couples to be put on the same shift." (Opp. at 19.) The support Plaintiff provides for that assertion, however, states that "deput[y fire chiefs] do try and make that accommodation wherever possible" and that "[i]n general, deputies accommodate, try and accommodate requests for those types of situations." (Graling Dep. Tr. 34:8-10, 20-22, at Opp. Ex. 54.) Plaintiff offers one example of a firefighter

who was transferred one month after he put in his request, July 2008. (Opp. at 20.)

Bland's transfer had to be coordinated between B-Shift's Deputy Chief Duane Dodwell and A-Shift's Deputy Chief David McKernan, because Bland's move could be accommodated only if another technician who wanted to transfer to her B-Shift. (Mem. at 11-12; Graling Dep. Tr. 14:17-21.)

Bland testified that Deputy Chief McKernan told her there was an opening in A-Shift and that she could have it if she wanted it. (Opp. at 20.) McKernan, however, testified that "[t]here was a whole process for [coordinating transfers]. It's almost a dance that goes through with all of these promotions and transfers . . . [a]nd it's very difficult to place everybody exactly where they want to go." (McKernan Dep. Tr. 18:5-7, 21-22, at Reply Ex. 14.) Plaintiff states that Thomas Graling testified that "McKernan agreed to the exchange." (Opp. at 20.) Graling testified that McKernan *and Dodwell* agreed to the exchange. (Graling Dep. Tr. 14:20-15:1.)

Plaintiff states that, in a contradiction, Deputy Chief Dodwell testified that *McKernan* held up the transfer but previously sent an e-mail saying McKernan approved it. (Opp. at 20.) The e-mail, however, states only that "it appears that Chief McKernan will accommodate" Bland's transfer. (Mem. Ex. 19.) Dodwell, moreover, testified that another firefighter,

Rudy Iturrino, whom had previously agreed to a transfer with

Bland, "shut down the transfer request, which would have opened

up the move for [Bland] to go to A-shift." (Dodwell Dep. Tr.

79:19-22, at Opp. Ex. 53.)

McKernan testified that:

it was like a four-way switch between drivers and
between three shifts. So we had it all set up.
One of those people in position [McKernan did not
recall that person's name] said at the last
minute--after we had it all worked out, everybody
was going to move, said I don't really want to
go. I want to stay where I am. And it just shut
everything down.

(McKernan Dep. Tr. 21:4-11, 21-22.)

Plaintiff asserts that Iturrino declined to change

shifts because Dodwell would not honor Iturrino's vacation days.

(Opp. at 21.) But, "if you switch shifts voluntarily, then [the

Department] will not honor your leave . . . [except for

extenuating circumstances. In this case, it wasn't extenuating

circumstances for Rudy [Iturrino]." (Graling Dep. Tr. 16:3-8.)

Dodwell testified that Rudy Iturrino "had a transfer request to

get to B-shift for years, I think." (Dodwell Dep. Tr. 81:8-12.)

The County asserts that Deputy Chief Dodwell approved

Bland's transfer request and advised Department management that

if an opening became available, Bland was to receive "first

consideration." (Mem. at 12.) Bland, however, states that

Frank Erwin, a technician A-Shift, retired in June 2008, and

Dodwell does not recall making a request for Bland to move to

the spot opened by Erwin's retirement. (Dodwell Dep. Tr. 84:13-16.) The County also asserts that Bland was also given the option of having her then-fiancé transfer to her B-Shift, but Bland's testimony is merely that she knew that the Department said it would try to move her fiancé to her shift. (Bland Dep. Tr. 142:19-143:2; Mem. at 12.)

The parties agree that effective January 17, 2009, Bland was reassigned from B-Shift to A-Shift. (Mem. at 13.)

xii.    Young Harasses Another Female Firefighter

According to Plaintiff, beginning in March or April of 2008 until May of 2010, Young harassed another female firefighter, Stacey Bailey. (Opp. at 16-17; Bailey Decl. ¶¶ 46, 47, 58, 62-65, 68-70, 74-76, 78-80, 83, at Opp. Ex. 5.) In May 2008, Young, in Bailey's presence, allegedly told another firefighter that the reason "they didn't like her" at her former fire station was "because she didn't put out." (Bailey Decl. ¶ 46.) Bailey was subjected to comments about whether she would "engage in 'tea bagging' with [male firefighters] or watch [male firefighters]" do so. (Bailey Decl. ¶ 47.) "Tea bagging" is a slang term for oral sex. (Bailey Decl. ¶ 47.)

Young made further comments to Bailey, including telling her that he "[would] give [her] a shot of protein, girl! Some yum protein pow!," while gesturing toward his genital area. (Bailey Decl. ¶ 62.) Young also told Bailey they could have a

"nice three way" and asked Bailey if she had any sex toys.
(Bailey Decl. ¶¶ 65, 68.)

    xiii.    Other Incidents of Inappropriate Conduct

Plaintiff, in Opposition, asserts that sex-based
harassment in the Department is widespread.  (Opp. at 1-4.)
Taking into consideration the evidentiary issues raised by
Defendant in its Reply, which the Court addressed above, and
having reviewed the record, the following are items presented by
Plaintiff that the Court finds are properly before it pursuant
to the relevant evidentiary standards.

The record contains some evidence that certain
firefighters believe sexual comments are common in the
department.  For example, one firefighter testified that it is
"common with a lot of guys" in the Department to use "crude
terms about women."  (O'Connor Dep. Tr. 65:6-11, at Opp. Ex.
30.)  Sexual joking happens "every day at the firehouse"
according to Susan Tomczak.  (Tomczak Dep. Tr. 15:20-22, at Opp.
Ex. 31.)  Sexual bantering is a regular part of the culture
within the Department, according to Young.  (Young Dep. Tr.
22:22-23:3.)  Bland testified that "[t]here is always a certain
level" of inappropriate sexual comments, describing one incident
in which one firefighter told her, in front of "several
individuals," that he would like to see her "in a pair of chaps
without anything on underneath."  (Bland Dep. Tr. 66:7, 18-23,

at Opp. Ex. 48.)  And, firefighter Danny Thompson testified that he "knows" that comments such as "tea bagging" and "protein shake," a slang term for ejaculation, happen "everyday" both at his fire station and others and "that is how [the Department] is[, and] it has always been like that since as far as I have know [sic]."  (D. Thompson Interview 48:3-9, 43:6-8, at Opp. Ex. 42.)

The record also reflects that certain firefighters have experienced inappropriate, if not harassing, conduct. Captain Pete Pullen made inappropriate advances on then-Lieutenant Felicia Edwards.  (Edwards Dep. Tr. 103:17-104:5, at Opp. Ex. 27.)  Daniel Kwiatkowski referred to a female firefighter as "fatty" and "fat-pill" and referred to another's "wide ass."  (Opp. Exs. 6-7.)  Lieutenant Jackson refers to a female firefighter as "naughty girl" and a "blonde thing." (Opp. Ex. 8.)  Mitch Lake made a sexual joke in front of a female firefighter with his pants unzipped and his coat-sleeve in his pants.  (Hemingway Dep. Tr. 48:9-22, at Opp. Ex. 55.) Male firefighters participated in, and observed without stopping, other firefighters forcing a female firefighter into a chair and binding her with duct tape.  (Op. Ex. 13.)  Captain Iacone referred to a female firefighter as a "lesbian" in a "derogatory manner" after an altercation.  (Op. Ex. 24.)

According to her Declaration, Stacey Bailey experienced similarly inappropriate conduct. Caldwell Clarke asked Bailey if she "only f**ked black dudes," if she "g[o]t [her] period and boobies when [she was] 12," and if she "f**k[ed] when [she was] 12." (Bailey Decl. ¶¶ 4, 6-7.) While watching celebrity chef Rachel Ray on television, Clarke told Bailey he would "like to f**k [Rachel Ray] with some extra virgin olive oil big time." (Bailey Decl. ¶ 10.) Clarke also Bailey, while she prepared dinner, if she would "bend over the table a little more[, and he] could do you from behind right here!" (Bailey Decl. ¶ 19.) Mike Nelson told Bailey she had "great boobs." (Bailey Decl. ¶ 14.) Captain Iacone asked Bailey how "[her] knees [were] doing? Do they hurt as much as in your other profession?" (Bailey Decl. ¶ 17.) In front of Bailey, Cliff Berner looked at "a woman dipping her nipples into two beer glasses on the internet." (Bailey Decl. ¶ 23.)

> ### C.    Procedural Background

Plaintiff filed suit against the County on September 15, 2010. [Dkt 1.] On March 24, 2011, the County moved for summary judgment. [Dkt. 18.] Plaintiff opposed the Motion on April 5, 2011, [Dkt 26], and the County replied in support on April 8, 2011, [Dkt. 28]. Both parties submitted supplemental briefs in support and opposition. [Dkts. 31-32.] Defendant's Motion is before the Court.

## II.  Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted).  The party seeking summary judgment has the initial burden of showing the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The party opposing summary judgment may not rest upon mere allegations or denials.  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quotation omitted).

Unsupported speculation is not enough to withstand a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).  Summary judgment is

appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

### III.  Analysis

Plaintiff asserts three claims against the County. Plaintiff alleges that, by allowing Young to sexually harass her, the County (1) "denied her the equal protection of the laws in violation of Title VII," (2) violated the Fourteenth Amendment's Equal Protection Clause, and (3) violated Title VII and the Equal Protection Clause by retaliating against her after she complained about Young's conduct.  (Compl. ¶¶ 9, 11-12). The Court will address each in turn.

### A.  Title VII Sexual Harassment Claim

Title VII states that "[i]t shall be an unlawful employment practice for any employer . . . to discriminate against any individual with respect to [her] . . . conditions, or privileges of employment, because of . . . sex."  42 U.S.C. §

2000e-2(a)(1).  A hostile work environment due to sexual

harassment is one such unlawful employment practice actionable

under Title VII.  *Briggs v. Waters*, 484 F. Supp. 2d 466, 476

(E.D. Va. 2007).

To establish a claim against an employer under Title

VII for creating a hostile work environment because of sexual

harassment, "a plaintiff must show 'that the offending conduct

(1) was unwelcome, (2) was based on her sex, (3) was

sufficiently severe or pervasive to alter the conditions of her

employment and create an abusive work environment, and (4) was

imputable to her employer.'"  *Ziskie v. Mineta*, 547 F.3d 220,

224 (4th Cir. 2008) (citing *Ocheltree v. Scollon Prod., Inc.*,

335 F.3d 325, 331 (4th Cir. 2003)).  The County contests only

the third and fourth elements, severity or pervasiveness and

imputability to the County.

i.    Severity or Pervasiveness

As to the third element, "whether the conduct was

'severe or pervasive' enough to create an abusive work

environment[,] [t]here are 'both subjective[3] and objective

components' to this element."  *Ziskie*, 547 F.3d at 227 (quoting

*Ocheltree*, 335 F.3d at 333).  Thus, "[t]he environment must be

perceived by the victim as hostile or abusive," the subjective

portion, "and that perception must be reasonable[,]" the

---

[3] The parties do not contest whether Bland found Young's conduct to be
subjectively severe or pervasive.

objective portion of the test. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). "The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). "[H]arassment is considered sufficiently severe or pervasive to alter the terms or conditions of the employment if a workplace is 'permeated with discriminatory intimidation, ridicule, and insult.'" *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009) (quoting *Harris*, 510 U.S. at 21).

Whether harassment is severe or pervasive discrimination "depends on a constellation of surrounding circumstances, expectations, and relationships." *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 696 (4th Cir. 2007) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999)). "All the circumstances are examined, including the positions and ages of the harasser and victim, whether the harassment was frequent, severe, humiliating, or physically threatening." *Id.* (citing *Davis*, 526 U.S. at 650-51). Significantly, "[e]vidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances." *Id.* (citing Harris, 510 U.S. at 19).

The "[severe or pervasive] standard is designed to
'filter out complaints attacking the ordinary tribulations of
the workplace, such as the sporadic use of abusive language,
gender-related jokes, and occasional teasing.'" *Ocheltree*, 335
F.3d at 333 (quoting *Faragher v. City of Boca Raton*, 524 U.S.
775, 788 (1998)). "At the same time, the standard 'protect[s]
working women from the kind of male attentions that can make the
workplace hellish for women.'" *Id.* (quoting *Baskerville v.
Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) (alteration
in original)). Ultimately, "[t]he question of whether
harassment was sufficiently severe or pervasive is
quintessentially a question of fact." *Hoyle v. Freightliner,
LLC*, --- F.3d ----, No. 09-2024, 2011 WL 1206658, at *7 (4th
Cir. Apr. 1, 2011) (internal quotation and citation omitted).

Defendant argues that Bland cannot establish that
Young's conduct was either severe or pervasive because the
complained-of conduct "would not lead a reasonable person to
believe that [Bland] was subjected to unwelcome conduct that was
sever, pervasive, repeated, and continuous." (Mem. at 18.)
Defendant also argues that "'pervasiveness' is not present where
the complaints consist of isolated incidents involving different
persons." (Mem. at 18.) For her part, Plaintiff argues that
taking into account the context of all of Young's conduct and
taking into account the workplace environment as a whole, a

reasonable juror could find that the complained-of conduct was severe or pervasive. (Opp. at 23-24.)

Here, examining all of the circumstances and taking the evidence in the light most favorable to the non-movant, Defendant has not established that no reasonable juror could find that Young's harassment was sufficiently severe or pervasive to alter the terms or conditions of Bland's employment. Though the complained-of incidents, three in-person meetings and six telephone conversations, were spread over a six-year period, when viewed in context a reasonable juror could find that Young's conduct crossed the line from "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" into "the kind of male attentions that can make the workplace hellish for women." *Ocheltree*, 335 F.3d at 333. Viewing the evidence in the light most favorable to Bland, a reasonable juror could "conclude that the multiple incidents . . . here were far from mildly inappropriate." *Hoyle*, 2011 WL 1206658, at *8.

In the August 22, 2001, interview incident, Young asked Bland a number of harassing questions: "does your husband approve of this profession," "do you enjoy having sex with more than one partner," and "do you like to be watched while you masturbate." (Mem. at 3.) Young also told Bland that he "knew

things about [her]" and asked her to accompany him to a sex-toy shop. *Id*. These comments are more than mere gender-related joking or sexual innuendo. Young's "knew things about [Bland]" comment is particularly severe, as he testified that he had access to applicant's personnel files. (Young Dep. Tr. 71:17-72:4.) Also contextually significant is Young's position relative to Bland as a more-senior firefighter and recruitment interviewer, which increases the severity of the conduct.

From January 2002 to July 2002, while attending recruit school, Bland received "two or three" telephone calls from Young. (Mem. at 4.) During these conversations, Young asked Bland to go with him to the sex-toy shop, asked her about her family, husband, and marriage, and told her he "[knew] things about [her]." (Mem. at 5.) A reasonable juror could likewise find these comments to be more than merely sporadic abusive language, gender-related jokes, and occasional teasing.

From July 2002 to June 2003 Bland received "three or four" telephone calls from Young, the content of which was "[s]imilar to identical" to the telephone calls she received while at recruit school. (Bland Dep. Tr. 72:17-20, 73:4-6; Mem. at 5.) Again, in isolation these "three or four" calls might be merely vulgar and inappropriate, but in context a reasonable juror could find them severe.

On November 9, 2007, Young again told Bland he "[knew] all about [her]." (Mem. at 6.) Throughout the day, Young and others in the crew engaged in "continual banter laced with sexual innuendos," though not directed at Bland. (Bland Dep. Tr. 80:15-21; Mem. at 6.)

The November 25, 2007 incidents likewise were more than mere innuendo and jest. Young's comment, as he passed by Bland carrying a "pike pole," a six- to ten-foot tool topped with a hook used to pull down ceilings, that "this looks like it would hurt" and "kind of made that gesture" that Bland describes as "jabbing,"[4] (Opp. at 14.), could be found by a reasonable juror to be a physical threat, sexual or otherwise or at least more than workplace banter. Defendant's argument, (Reply at 17), that the sole witness to the event, Nancy Sanfacon, thought Young was joking, is probative of what *she* thought, but does not in itself illustrate that *all* reasonable people would agree with her. Young's second comment on that day, that he "would smile at [Bland], wink or whatever, and say 'you are squeezing me,'" (Bland Dep. Tr. 96:22-97:1), while handing a fire hose to Bland, taken by itself might be mere sexual banter, but taken in the larger context could be found to be severe harassment.

---

[4] Defendant argues that prior to Bland's tardy interrogatory responses, she never described Young's gesture as "jabbing." (Reply at 16 n.10.) The Court notes that a reasonable juror, when considering the fact of Young holding a six- to ten-foot pole and saying "this looks like it would hurt" could find this physically threatening whether Young was "jabbing" with the pike pole or not.

Also instructive is the "[e]vidence of a general atmosphere of hostility toward those of the plaintiff's gender," which may be "considered in the examination of all the circumstances" when determining the severity or pervasiveness of Young's conduct. *Jennings*, 482 F.3d at 696 (citing Harris, 510 U.S. at 19). As set forth above, Plaintiff has presented evidence of various incidents of sexual harassment or at least sexually inappropriate conduct that a reasonable juror could find as evidence of an atmosphere of hostility toward female firefighters. This atmosphere is further context that could support a finding that Young's conduct was sufficiently severe or pervasive.

Another circumstance that makes this case different from others is that Bland and Young worked as firefighters. Firefighters depend on their coworkers for protection and safety. Thus, an atmosphere of hostility, whether due to sexual harassment or other inappropriate conduct, is inherently more severe than in a work environment where a coworker's disrespect and disregard will not put one's safety in danger. As Young himself puts it, "you don't want to go into a burning building or in any type of scene where somebody is not gonna look out for your best interest . . . "[y]our best interest is staying alive." (Young Dep. Tr. 20:8-13.)

The Fourth Circuit's recent decision in *Hoyle v. Freightliner, LLC*, --- F.3d ----, No. 09-2024, 2011 WL 1206658 (4th Cir. Apr. 1, 2011), is instructive. There, the Court reversed the district court's grant of summary judgment in favor of the defendant as to plaintiff's Title VII sexual harassment claim. *Hoyle*, 2011 WL 1206658, at *9. The Court found that a the district court erred in finding that no reasonable juror could find the alleged sexual harassment was severe or pervasive on facts far less offensive than here. *Id.* In *Hoyle*, the plaintiff, who worked at her employer's truck assembly plant, was subjected to: (1) a tampon tied to a key ring on a truck in her work area; (2) photos of scantily-clad women in G-strings taped to the lid of a company-issued toolbox; (3) a comment that she was "taping up [her] pant legs now so [other employees] can't see up under [her] pants;" (4) sexually provocative calendars brought in by a coworker to share with others, showing revealing photos of women in in bathing suits, wet, and lying in water in different positions; (5) other photos that male coworkers kept taped to their company toolboxes, including one of a coworker's wife "in a G-string kind of like bent over;" and (6) a nude photo of a woman as the company computer's screensaver. *Hoyle*, 2011 WL 1206658, at *1-3.

Although the *Hoyle* incidents occurred from late May or early June 2005 to November 2005, *id.*, a shorter time frame than

in this case, the alleged incidents are far less severe than those in this case. As the *Hoyle* court stated, "[t]he question at the summary judgment stage is not whether a jury is *sure* to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find." *Hoyle*, 2011 WL 1206658, at *9 (emphasis in original). The Court bears *Hoyle* in mind here.

Thus, looking at the totality of the circumstances and taking the evidence in the light most favorable to the non-movant, Defendant has not shown that no reasonable juror could find that Young's conduct was severe or pervasive enough to create an abusive work environment.

### ii.   Imputable to the County

As to the fourth element, imputing Young's conduct to the County, "[i]n a case where an employee is sexually harassed by a coworker[5] . . . the employer may be liable only 'if it knew or should have known about the harassment and failed to take effective action to stop it.'" *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006) (quoting *Ocheltree*, 335 F.3d at 334).

---

[5] The parties appear to agree that Young was not Bland's supervisor, which would subject Defendant to a higher standard for culpability than the standard for coworker harassment. *See Howard*, 446 F.3d at 565 (stating that in a case of harassment by a supervisor 'with immediate (or successively higher) authority over the employee,' an employer is vicariously liable for the harassment, subject to limited affirmative defenses" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998))). Regardless of whether Young was Bland's supervisor, Defendant has not shown that summary judgment is appropriate with respect to whether Young's offending conduct is imputable to the County under either standard.

In this case, a reasonable juror could find that Defendant knew or should have known about the harassment and failed to take effective action to stop it. The County argues that "[b]ecause the Department had no notice of the August 22, 2001 interview and the six telephone calls between January 2002 and June 2003, it had no opportunity to investigate or take corrective action . . . and it cannot therefore, be held liable." (Mem. at 23.) And, once Bland reported the November 2007 incident, the Department "promptly investigated and remedial action was taken." (Mem. at 23.) Defendant emphasizes that Young's conduct stopped after Bland reported him. (Mem. at 22.)

Plaintiff, however, asserts that Bland first notified her captain of Young's sexual harassment in March of 2006, well before the November 2007 incidents, and asserts that Bland's then-captain took no corrective or protective action. (Opp. at 7; Bland Decl. ¶ 2.) Because of Plaintiff's having told a Department *captain* in March 2006, a reasonable juror could find that Defendant knew or should have known about the harassment and failed to take effective action to stop it. Moreover, Captain Mohler acknowledged in his deposition that he had received a complaint that Young had harassed a woman in "either 2004 or 2006" at a convention. (Mohler Dep. Tr. 7:13-8:19, at Opp. Ex. 34.) As the Fourth Circuit has stated, "[a]n

employer's knowledge that a male worker has previously harassed female employees other than the plaintiff will often prove highly relevant in deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee's harassing conduct." *Paroline v. Unisys Corp.*, 879 F.2d 100, 107 (4th Cir. 1989), *vacated and remanded on other grounds*, 900 F.2d 27 (4th Cir. 1990).  Also significant is that, though Defendant is correct in arguing that Young ceased harassing Bland after she reported him, Young allegedly harassed another female firefighter in various incidents from April 2008 to January 2010.  (Bailey Decl. ¶¶ 46, 47, 58, 62-65, 68-70, 74-76, 78-80, 83.)  Taking the record in the light most favorable to the non-movant, a reasonable juror could find that Defendant knew or should have known about the harassment and failed to take effective action to stop it, because despite the County's written reprimand Young continued to sexual harass at least one other female firefighter.

Defendant asserts that the County and the Department have written policies that prohibit sexual harassment and procedures in place for employees to report and for the Department to address any complaints of sexual harassment.  That is surely correct, but will not, in itself, defeat imputability here.  As the Fourth Circuit has recently noted, a reasonable "juror could find, as we have observed in analogous

circumstances, that the problem with the . . . policy lies not in theory but in practice" in a particular situation. *Hoyle*, 2011 WL 1206658, at *10. "A reasonable juror could reasonably conclude on this record that [the Department] had actual or constructive notice of [Young's] sexually harassing incidents and displays and failed to follow its own policies calling for a firm response designed to end [Young's] harassment." *Id*. Accordingly, taking the evidence in the light most favorable to Bland, summary judgment is not appropriate as to the imputability element, and, thus, the Court will deny summary judgment as to the Bland's Title VII sexual harassment claim.

      B.  <u>Equal Protection Claim</u>

The Court turns to Bland's next claim, that the County violated the Fourteenth Amendment's Equal Protection Clause. (Compl. ¶ 9.) Bland argues that the County is liable under 42 U.S.C. § 1983 because Young's constitutionally offensive sexual harassment was taken in furtherance of some municipal "custom." (Opp. at 26.)

"[I]ntentional sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under § 1983." *Mikkelsen v. DeWitt*, 141 F. App'x 88, 90 (4th Cir. 2005) (quoting *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994)). A municipality's liability under § 1983, however, "may not be predicated solely upon a

respondeat superior theory.  Liability arises only where the

constitutionally offensive acts of city employees are taken in

furtherance of some municipal 'policy or custom.'"  *Milligan v.

City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (citing

*Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978)).

A municipality's policy "may be found in written

ordinances and regulations, in certain affirmative decisions of

individual policymaking officials, or in certain omissions on

the part of policymaking officials that manifest deliberate

indifference to the rights of citizens."  *Carter v. Morris*, 164

F.3d 215, 218 (4th Cir. 1999) (internal citations omitted).

Municipal liability under § 1983 also may be predicated on a

municipal "custom or usage."  *Id.*

"[T]he existence of such a 'custom or usage' may be

found in 'persistent and widespread . . . practices of

[municipal] officials [which] [a]lthough not authorized by

written law, [are] so permanent and well-settled as to [have]

the force of law.'"  *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th

Cir. 1987), *cert. denied*, 484 U.S. 1027 (1988) (quoting *Monell*,

436 U.S. at 691) (alteration in original).  Municipal liability

based on "'[c]ustom and usage,' in the sense of 'persistent and

widespread . . . practices' by municipal agents and employees,

may be attributed to a municipality when the duration and

frequency of the practices warrants a finding of either actual

or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Id.* at 1387 (quoting *Bennett v. Slidell*, 728 F.2d 762, 768 (5th Cir. 1984)). "Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." *Id.*

Municipal liability attaches "only when the municipality itself can be directly charged with fault for a constitutional violation." *Id.* at 1387-88. Thus, "even where such a 'policy' of municipal inaction might be inferred, it must still be shown to have been the 'moving force of the constitutional violation' specifically charged in order to create municipal liability." *Milligan*, 743 F.2d at 230 (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)). Moreover, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so," through, for example, a custom, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Carter*, 164 F.3d at 218 (internal quotations and citations omitted).

Bland argues that the County is liable under § 1983 because Young's constitutionally offensive sexual harassment was

taken in furtherance of some municipal "custom." (Opp. at 26.)
Specifically, Bland argues that the "the County knew that sexual
harassment, sexual innuendo and joking is the custom" in the
Department, that the Department had a custom of tolerating this
conduct by "failing to take adequate remedial measures" and
conducting inadequate investigations, and that the Department
failed to train its employees. (Opp. at 27.) The County argues
that the undisputed facts are insufficient to prove such a
custom.[6] (Mem. at 27.)

> i. "Custom" of Sexual Harassment

With respect to Bland's argument that the sexual
harassment, innuendo and joking is a "custom" within the
Department, Bland has proffered evidence that certain
firefighters--five, including Bland herself--believe that crude,
sexual bantering or joking happens "every day" at their and
other firehouses. *See supra* at I.B.xiii. Bland proffered
evidence illustrates certain inappropriate comments and acts by
other firefighters, including numerous allegations from Stacey
Bailey. *See id*. Though this evidence is disconcerting and all

---

[6] Defendant states that "the undisputed facts show that since 2000 there have
been fourteen complaints of gender discrimination, sexual harassment, or
hostile work environment . . . all of which were investigated" and
disciplined when warranted. (Mem. at 27.) Of those fourteen complaints, ten
occurred prior to Bland's November 2007 complaint. (Mem. at 27.) Defendant
argues this evidence is insufficient to find persistent and widespread abuse.
(Mem. at 27.) The Court notes that this evidence offers more instances of
harassment than does that offered by Bland. Even using the County's
evidence--and of course Plaintiff bears the ultimate evidentiary burden--this
evidence, without context and standing alone, would not be sufficient to show
practices so permanent and well-settled as to [have] the force of law.

of it reflects inappropriate behavior, not all of it rises to the level of sexual harassment. Even if it did, a scattershot litany of isolated incidents, presented without temporal and other context, and much of it apparently directed at one particular firefighter, will not suffice to prove a *custom* of sexual harassment so permanent and well-settled as to have the *force of law.* *Spell*, 824 F.2d at 1386. A reasonable juror could very well find that the Department has a custom of boorish and inappropriate behavior, but "there is a line between what can justifiably be called sexual harassment and what is merely crude behavior." *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008) (Wilkinson, J.). No reasonable juror could find that custom was one of sexual harassment so pervasive as to have the de facto *force of law* attributable to the County.

Bland also argues that the "custom at the [Department] is to treat women who complain about sexually harassing comments or behavior as 'ratting' on the men and to 'make the situation worse' for the victim." (Opp. at 4.) The testimony Bland cites for this proposition, however, is one firefighter's statement that he did not tell Stacey Bailey's captain about Bailey's alleged harassment because he did not want to make it worse for Bailey because she may be seen as "ratting" on her alleged harasser, (O'Connor Dep. Tr. 26:8-21), and another's own opinion

why other firefighters do not report sexual comments, (D.
Thompson Dep. Tr. 93:5-15, at Opp. Ex. 32).

Bland also claims that Edwards, the Department's EEO
officer "believes that sexual harassment is only a problem if
the woman is a 'shrinking violet and [does not] want to stand up
for [her]self.'" (Opp. at 5.) Edwards, when asked about women
more hesitant to be assertive in the face of sexual joking
stated that "[she does not] think anybody is a shrinking violet
that comes in the fire service . . . [a]nd . . we have in our
policy that says [the employee] can go to a supervisor" or other
options, like the EEO and Equity Programs, "[s]o there are
options available for all employees [] if [they are] not
comfortable." (Edwards Dep. Tr. 85:17-86:10.)

Viewed in context, this evidence of three fire
fighters' own opinions likewise does not suffice to prove a
custom of sexual harassment so permanent and well-settled as to
have the force of law.

ii.    "Custom" of Inadequate Remedies and
       Investigations

Bland also argues that the County should be held
liable under § 1983 because the Department had a custom of
failing to take adequate remedial measures and conducting
inadequate investigations. (Opp. at 27.) Bland's support for
this claim, however, illustrates that the Department *does*
discipline individuals, including, for example, placing

reprimand letters in files, transferring employees, and requiring diversity training. (Opp. at 7-9.) Bland points to two instances in which a firefighter received no discipline. In one case, Daniel Kwiatkowski referred to a female firefighter as "fatty" and "fat-pill" and referred to another's "wide a**," and apparently received no discipline. (Opp. at 8.) In the other, Dominick Ianelli received no discipline for, while naked, squatting over another firefighter. (Opp. at 8.) The Ianelli incident was in the "mid to late 80s." (Mohler Dep. Tr. 7:6-7.)

Bland also argues that the Department fails to take adequate remedial measures because it has no set-in-stone punishment for sexual harassment, and that a first or second offense "could result in no discipline," citing Chief Mastin's deposition testimony. (Opp. at 7.) Chief Mastin, however, testified that "[t]he punishment obviously would be determined again based on an investigation of circumstantial facts and past history." (Mastin Dep. Tr. 48:19-22, at Opp. Ex. 33.) Chief Mastin testified that a first or second offense could receive a range of discipline, "from nothing to termination," but that he could not imagine a that a "sustained" finding "would have zero impact" on a first, second, or third offense. (Mastin Dep. Tr. 49:3-18.)

Taking this evidence in the light most favorable to Bland, no reasonable juror could find that it is sufficient to

prove a custom of sexual harassment so permanent and well-settled as to have the force of law. *Spell*, 824 F.2d at 1386. Although Bland may view these sanctions as insufficient, they demonstrate that the County does not have a widespread practice of condoning sexual harassment. *See Valentine v. Chicago*, 452 F.3d 670, 685 (7th Cir. 2006). The evidence illustrates that the Department investigates allegations of harassment and disciplines when appropriate. Though Bland has provided two instances where firefighters were not disciplined, these are two isolated incidents, one of which was over 20 years ago, and are insufficient to prove a custom of sexual harassment so permanent and well-settled as to have the force of law.

      iii.    <u>Failure to Train</u>

Bland also argues that the County may be liable under § 1983 on a theory of failure to train its employees. (Opp. at 27-28.) Bland's argument rests on evidence that certain officers do not understand the Department's sexual harassment policies and on evidence that certain employees have not received training "in years, sometimes decades." (Opp. at 10.)

A municipality may be held liable under § 1983 for constitutional violations resulting from its failure to train municipal employees, but "only when such failure reflects 'deliberate indifference' to the rights of its citizens." *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000) (citing *Canton*

47

*v. Harris*, 489 U.S. 378, 388 (1989)).  Thus, a municipality may

be liable for a failure to train under § 1983 "[o]nly where a

failure to train reflects a 'deliberate' or 'conscious' choice

by a municipality." *Harris*, 489 U.S. at 289.  "Deliberate

indifference is a very high standard--a showing of mere

negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692,

695 (4th Cir. 1999).  As the Supreme Court has recently stated,

"[a] municipality's culpability for a deprivation of rights is

at its most tenuous where a claim turns on a failure to train."

*Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).

          Here, no reasonable juror could find that the alleged

failure to train reflects a deliberate or conscious choice by

the County.   As to her inadequate training argument, Bland

argues that despite any training they may receive, the

Department's employees do not understand that sexual comments

and joking are not permitted.  (Opp. at 9.)  In support, Bland

points to three firefighters who state that certain statements

do not violate the Department's policy. *Id.*  For example, Bland

argues that Chief Mastin "testified that it does not violate the

policy for an officer to say to a firefighter [that] 'you have a

nice a\*\*.'" *Id.*  Chief Mastin, however, testified that whether

such a comment violated the Department's policy "depends on all

the circumstances."  (Mastin Dep. Tr. 51:1-6, at Opp. Ex. 33.)

Bland also argues that EEO counselors' understanding of the

Department's policy is deficient. (Opp. at 10.) As to Bland's argument that the Department does not train *at all*, her support for this does not illustrate a deliberate indifference on the part of the County. Bland offers four firefighters who state that they have not received training since recruit school, but they have received training. (Opp. at 10.)

Taking this evidence in the light most favorable to Bland, no reasonable juror could find that these failures to train reflect a deliberate or conscious choice by the County such that it can be municipally liable under § 1983. *Harris*, 489 U.S. at 289. These examples may illustrate some negligence on the part of the Department in executing its training program. The Department, however, undisputedly provides training, and the evidence put forth by Plaintiff, that a few firefighters have not received recent training or misunderstand the Department's policy, is not enough to satisfy the high standard, *Grayson*, 195 F.3d at 695, required to show that the County was deliberately indifferent to the rights of its citizens.

C. Title VII Retaliation Claim

The Court turns to Bland's third claim, that after she complained of Young's alleged conduct, the County violated Title VII and the Equal Protection Clause by retaliating against her. (Compl. ¶¶ 11-12.)

To succeed on her retaliation claim, Bland "must prove that (1) she engaged in a protected activity,[7] (2) the employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action." *Hoyle*, 2011 WL 1206658, at *11 (citing *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007)). "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for his termination, the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, 2011 WL 1206658, at *11 (quoting *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2006)).

## i.    Bland's *Prima Facie* Case

Bland argues that the adverse employment action on the part of the County was a delayed transfer, which Deputy Chief Dodwell delayed in retaliation for her complaint against Young. (Opp. at 29.)  The County argues that Bland cannot show that there was any adverse employment action because she was in fact transferred in January of 2009, nine and one-half months after her request, that Bland cannot show that any such action was taken against her because of her complaint, and that any delay

---

[7] Defendant does not contest that Plaintiff engaged in a protected activity, so the Court will not address this element.

was due to having to find an employee to move to Bland's shift. (Mem. at 12, 29.)

Here, even assuming the County acted adversely, Bland must still prove the causal connection between her complaint against Young and her allegedly delayed transfer. As to this third element of her retaliation claim, no reasonable juror could find that she has set forth a *prima facie* case of retaliation.

According to Bland, the causal connection is Deputy Chief Dodwell. Specifically, Bland argues that "Dodwell delayed her transfer in retaliation for her complaint against Young. When Dodwell learned of her complaint, he blamed her by intimating that she was intimidated by Young because he is black[,] and then denied what he said." (Opp. at 29.)

This argument is unavailing because the evidence in the record does not support it. Nowhere does Dodwell "blame" Plaintiff for her complaint. A review of the relevant support is helpful.

Bland explains the basis of her assertion that Dodwell "intimat[ed] that she was intimidated by Young because [Young] is black," (Opp. at 29), in her deposition. According to Bland, Sheryl Hemingway, the EEO counselor to whom Bland reported her complaint against Young, "told [Bland] that [Dodwell] had given [Hemingway] two [EEO personnel] business cards with Nan Butler's

name on it, and that Nan Butler's name had been crossed off [of one card]. Kathy Smith's name had been put on it." Nan Butler is African-American and Kathy Smith is Caucasian. (Bland Dep. Tr. 109:5-8, at Mem. Ex. 1.) Bland states[8] that "[Dodwell] instructed [Hemingway] to give me these two business cards[,]" one with Nan Butler's name and one with Nan Butler's name crossed off and replaced with Cathy Smith's name, and Dodwell *told [Hemingway] to advise me that I should make an appointment with Kathy Smith*," the Caucasian woman, "*because I may be intimidated by tall black people*." (Bland Dep. Tr. 109:10-15 (emphasis added).)

According to Hemingway's deposition testimony, after Hemingway told Dodwell she had given Bland Nan Butler's name, "Chief Dodwell said just . . . [g]ood job. Okay. Great. Good job and everything. Just remember there are several people over there to speak with. That Nan [Butler] is only one of many people." (Hemingway Dep. Tr. 114:8-11, at Reply Ex. 11.) Hemingway further testified that "I think [Dodwell's] concern--and *this is only what I'm thinking*--is that Tim Young is African-American and Nan Butler is African-American. That [Bland] may be comfortable with choosing somebody who she might be comfortable with. So it was an alternative if [Bland] wishes

_____

[8] Bland's interrogatory responses, which the County argues the Court should not consider because Bland provided them after the close of discovery, state that "Captain Hemingway told Bland that Dodwell stated that [Bland] should make an appointment with Kathy Smith rather than Nan Butler because [Bland] may be intimidated by tall[,] black people." (Opp. Ex. 1, at 4.)

to speak with anyone else." (Hemingway Dep. Tr. 114:14-19

(emphasis added).) The following exchange from Hemingway's

deposition is instructive:

> Q: So [Dodwell] didn't say anything about Nan
> Butler or Cathy Smith's race?
> A: *I mean, I know* what Nan Butler's [and Cathy
> Smith's] race is.
> Q: Right. I guess what I'm asking you is: *Did
> [Dodwell] say anything to you to the effect of
> tell [Bland] to see Cathy because she may be
> intimidated by black people*?
> A: *No*. [Seeing Cathy Smith] was an option. No.
> It was more of an option that [Butler] is not the
> only person over there to talk with.

(Hemingway Dep. Tr. 115:4-13 (emphasis added).) Thus, the only

evidence in the record that Dodwell said Bland was "intimidated

by tall, black people" is Bland's own testimony that Hemingway

told Bland that Dodwell said so. Hemingway, however, testified

that Dodwell did not say anything to her to this effect and,

moreover, that Nan Butler's and Cathy Smith's race came into

play only because Hemingway knew their skin-color. Hemingway,

moreover, testified that this "intimidation" is only what

*Hemingway* was thinking.

Even assuming Dodwell told Hemingway to tell Bland to

see a white EEO counselor because he though Bland was

"intimidated by tall, black people," that does not support

Bland's contention that this means Dodwell "blamed" Bland for

her complaint against Young. There is nothing in the record

support Bland's assertion that Dodwell "blamed" her for her

complaint against Young. Hemingway's testimony does not support

this, nor does anything except Bland's own assertion that
Hemingway told Bland that Dodwell said so.  Because there is no
support in the record for this assertion, any connection between
Dodwell's alleged "intimidated" statement and the allegedly
delayed transfer is tenuous.

Bland argues, in effect, that a reasonable juror could
find a causal connection between her complaint and her delayed
transfer based solely on a Dodwell's "intimating" that Bland was
"intimidated by tall, black people" because Dodwell told
Hemingway to give Bland, in addition to two business cards of
African-American EEO counselors, the business card of a
Caucasian EEO counselor.  This, according to Bland, can
reasonably be found to have constituted Dodwell's "blaming"
Bland for her complaint against Young, presumably because Young,
like two of the three Dodwell-suggested EEO counselors, was
African-American.

No reasonable juror would make this leap.  The record
is devoid of any evidence that Dodwell blamed Bland for
anything.  Thus, the only offered causal connection between
Bland's complaint against Young is unsupported conjecture.
Accordingly, Bland has failed to put forth a *prima facie* case of
retaliation.

For support of her claim that Deputy Chief Dodwell was the cause of her delayed transfer, Plaintiff argues that at his deposition, Dodwell "denied that he even knew about Bland's complaint" against Young and that "a jury can consider Dodwell's dishonesty as affirmative evidence of his guilt," citing to *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146 (2000), for support.  (Opp. at 29.)  Even assuming that Dodwell indeed denied knowing about Bland's complaint, this argument is fatally flawed because the falsity of Dodwell's testimony would only be relevant after Bland put forth a *prima facie* case and, even then, only if Dodwell's dishonesty was material to her claim.

The *Reeves* court stated was that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of [an] explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the fact finder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt."  530 U.S. at 147 (internal quotations and citations omitted).

The *Reeves* court held that "a plaintiff's *prima facie* case, *combined with* sufficient evidence to find that the employer's asserted justification is false, may permit the trier

55

of fact to conclude that the employer unlawfully discriminated."
*Id.* at 148 (emphasis added). The Court noted, moreover, that
"'[i]t is not enough . . . to *dis*believe the employer; the
factfinder must *believe* the plaintiff's explanation of
intentional discrimination.'" *Id.* at 147 (quoting *St. Mary's
Honor Center v. Hicks*, 509 U.S. 502, 519 (1993)) (emphasis in
original). According to the Fourth Circuit, in *Reeves* "[t]he
Supreme Court . . . clarified the plaintiff's burden *at the
pretext stage*." *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d
846, 852 (4th Cir. 2001) (emphasis added).

Thus, Bland must still put forth a *prima facie* case of
retaliation, including, significantly, evidence of the causal
connection between her complaint and her allegedly delayed
transfer. After doing so, the burden would shift to the County
to put forth a legitimate reason for the delayed transfer, and
*then*, and only then, would the Court reach the falsity of
Defendant's asserted justification, and, thereby, any
"dishonesty" on Dodwell's part about whether he knew about
Bland's complaint. As set forth above, the Court finds Bland
has failed to put forth her *prima facie* case.

Even assuming, *arguendo*, that Bland put forth her
*prima facie* case, Dodwell's "dishonesty" about when or whether
he knew about Bland's complaint is immaterial. The general
principle of evidence law is that a fact finder is entitled to

consider a party's dishonesty about a *material* fact as affirmative evidence of guilt. It is not evidence of what Plaintiff argues it is. Bland would have the factfinder consider Dodwell's "dishonesty" regarding when or whether he knew about Bland's complaint as affirmative evidence that he delayed her transfer.

This conclusion does not follow from Dodwell's alleged "dishonesty." Neither the County nor Dodwell argue that any delay was legitimate because Dodwell was *unaware* of Bland's complaint, such that he could not have had a discriminatory intent in not transferring Bland because he was unaware of her allegations against Young. Rather, the County argues that any delay in Bland's transfer was the result of not being able to accommodate Bland's transfer with the necessary corresponding transfer. (Mem. at 12.) Thus, when and whether Dodwell knew of Bland's complaint is immaterial as affirmative evidence for Bland's *prima facie* case of proving her retaliation claim.

b.   The County Offered Different
      Justifications at Different Times

Bland argues that the County's evidence regarding the reasons for the delay is inconsistent, and that "[i]t is well-settled that a reasonable jury can find that an employer who offers 'different justifications at different times' for an adverse decision has acted unlawfully," citing to *Sears Roebuck*, 243 F.3d at 852. (Opp. at 29.)

Again, Bland makes this argument in support of her
*prima facie* case, but the *Sears Roebuck* "different
justifications at different times" reasoning addresses whether
an employer's non-discriminatory explanation for an adverse act
is *pretext*.  *See Sears Roebuck*, 243 F.3d at 852-53 ("[T]he fact
that [the employer] has offered different justifications at
different times for its failure to hire [the plaintiff] is, in
and of itself, probative of *pretext*.").

But regardless of whether Bland uses this argument in
support of her prima facie case or to show that the County's
non-discriminatory explanation was merely pretext, it must fail.

According to Bland, the first inconsistency in
justification is that "Graling testified that McKernan agreed to
the exchange . . . [y]et Dodwell testified that it was McKernan
who held up the transfer."  (Opp. at 20.)  Graling's testimony
to which Bland refers concerns the possible transfer of Rudy
Iturrino to B-Shift in exchange for Bland.  (Graling Dep. Tr.
13:18-20.)  Dodwell's testimony to which Bland refers concerns a
*different attempt* to transfer Brian Chinn, and Dodwell testified
that *as to the Chinn transfer*, McKernan said "no."  (Dodwell
Dep. Tr. 81:15-82:3.)

Bland next argues that Chief Mastin offered different
justifications for transfers falling through, as in his memo to
the director of Equity Programs he stated that McKernan did not

agree to the transfer, but in his deposition Mastin stated that he had no reason to believe that McKernan agreed or disagreed with the transfer. (Opp. at 21.) Though it is unclear from the record which transfer Chief Mastin is referring to in these comments, McKernan acknowledges in his deposition that "[McKernan] think[s] [he] was responsible for two of those times" when transfers fell through. (McKernan Dep. Tr. 21:21-22, at Reply Ex. 14.) It is far from clear that this illustrates any inconsistency.

Bland then argues that the County offers different justifications because Graling and Captain Gavin Bourjaily testified that Rudy Iturrino's transfer fell through because Dodwell would not accommodate all of Iturrino's leave dates, but Dodwell testified that the Department was going to accommodate those leave dates. (Opp. at 21.) The parties agree, and the record reflects, that Rudy Iturrino himself decided to withdraw his transfer request. Regardless of whether Iturrino's leave dates would be accommodated, this is immaterial. Not accommodating transfer leave was consistent with Department policy.

Graling testified that "if you switch shifts voluntarily, then [the Department] will not honor your leave . . . except for extenuating circumstances. In this case, it wasn't extenuating circumstances for Rudy [Iturrino]." (Graling Dep.

Tr. 16:3-8, at Opp. Ex. 54.) Moreover, *Bland's own transfer request form* contains a printed acknowledgement that "[the signer] acknowledges that if my request for a transfer is to another shift and this request is granted, any previously approved leave may be revoked if it exceeds the authorized leave slots for that shift." (Mem. Ex. 17.) Department policy was that leave may not be accommodated when one transfers shifts, so whether Iturrino's leave would be accommodated is immaterial.

The most significant flaw in Bland's argument, however, is that the above evidence does not show that the County offered different justifications at different times. Even viewed in the light most favorable to Bland, a reasonable juror would find that evidence to show that the County has offered *consistent* justifications. Namely, that the Department tried to accommodate Bland's transfer, but the transfers fell through, because here and in other instances, coordinating transfers is difficult. As Deputy Chief McKernan testified, "[t]here was a whole process for [coordinating transfers]. It's almost a dance that goes through with all of these promotions and transfers . . . [a]nd it's very difficult to place everybody exactly where they want to go." (McKernan Dep. Tr. 18:5-7, 21-22.)

What the *Sears Roebuck* court meant by "different justifications at different times" is illustrated by its review

of the employer in that case's justifications. "In [*Sears Roebuck*], Sears has, over time, proffered several reasons for its failure to hire [the plaintiff], including the selection of someone else, a lack of available hours in the loss prevention department, and the belief that [the plaintiff] had been investigated for sexual harassment in the past." 243 F.3d at 852. Here, the County has offered not *different* justifications, but examples of how the same justification played out in practice on different occasions. Thus, even assuming Bland has put forth a *prima facie* case for retaliation, no reasonable juror could find that the legitimate reason offered by the County was pretext.

### IV.  Conclusion

For these reasons, the Court will grant in part and deny in part Defendant's Motion.

An appropriate Order will issue.


|                        | /s/                                   |
|------------------------|---------------------------------------|
| May 3, 2011            | James C. Cacheris                     |
| Alexandria, Virginia   | UNITED STATES DISTRICT COURT JUDGE    |